**ORIGINAL**

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

CLARK FRENCH )
11374 Bishops Gate Lane )
Laurel, Maryland 20723, )
)
and )
)
COMPUTER INTELLIGENCE )
ASSOCIATES, INC. D.C. )
601 Pennsylvania Avenue, N.W. )
Suite 900S )
Washington, D.C.  20005 )
)
Plaintiffs, )
)
v. )
)
)
ROY KIME )
420 7th Street, N.W., Apartment 924 )
Washington, D.C.  20004, )
)
Defendant. )
)
)

**FILED**

DEC 2 2 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

CASE NUMBER  1:05CV02448

JUDGE: Ricardo M. Urbina

DECK TYPE: Contract

DATE STAMP: 12/22/2005

## COMPLAINT

For their Complaint against Defendant Roy Kime ("Kime"), Plaintiffs Clark French

("French") and Computer Intelligence Associates, Inc. D.C. ("CIA D.C.") state as follows:

### Parties

1.      Plaintiff Clark French is an individual citizen of Maryland who currently resides

at 11374 Bishops Gate Lane, Laurel, Maryland 20723.

2.      Computer Intelligence Associates, Inc., a District of Columbia Corporation ("CIA

D.C.") is a corporate citizen of the District of Columbia in that it is a corporation organized

under the laws of the District of Columbia and has its principal place of business at 601

Pennsylvania Avenue, N.W., Suite 900S, Washington, D.C. 20005.

3.    Defendant Roy Kime is an individual citizen of New York, who also maintains a

residence in the District of Columbia at 420 7th Street, N.W., Apartment 924, Washington, D.C.

20004, and who maintained a principal place of business in the District of Columbia at 601

Pennsylvania Avenue, NW, Suite 900S, Washington, DC, 20005.

### Jurisdiction and Venue

4.    This Court has jurisdiction to entertain this complaint pursuant to 28 U.S.C.

§1332 (diversity jurisdiction) and §1367 (supplemental jurisdiction). Venue is proper pursuant

to 28 U.S.C. § 1391. Personal jurisdiction over Kime is proper in the District of Columbia

pursuant to D.C. Code Ann. § 13-423. In addition, Kime resides in the District of Columbia,

maintained a principal place of business in the District of Columbia and regularly conducts

business in the District of Columbia.

### Nature of the Action

5.    This is an action for specific performance of a Restrictive Stock Transfer

Agreement (the "Stock Agreement") between the parties following the termination of Defendant

Kime's employment at CIA D.C., as well as an action by CIA D.C. to recover damages arising

from Kime's improper submission of expenses for reimbursement and receipt of an advance on

profit distributions. Pursuant to the Stock Agreement, upon termination of Defendant Kime's

employment at CIA D.C., Kime was obligated to immediately offer his shares of stock in CIA

D.C. first to the company, and then to the other CIA D.C. shareholder, Plaintiff French.

Although Kime has failed to offer his shares to CIA D.C. pursuant to his obligations under the

Stock Agreement, CIA D.C. passed a resolution stating that it will not avail itself of CIA D.C.'s

right to purchase Kime's shares should such an offer be forthcoming. Thus, French seeks to

enforce his right to purchase Kime's stock pursuant to the Stock Agreement. Despite repeated

requests, Kime has failed and refused to offer his stock for sale to French in breach of the Stock

Agreement. French has at all times been ready, willing and able to pay the agreed-upon

consideration for the shares. Kime should thus be required to perform pursuant to the Stock

Agreement and tender his CIA D.C. shares to French in exchange for the agreed upon

consideration. In addition, CIA D.C. seeks recovery for Kime's breach of his agreement related

to a $51,000 advance of profit distributions. CIA also seeks damages related to CIA D.C.'s

reimbursement of expenses that Kime falsely represented were related to CIA D.C.'s business in

breach of the fiduciary duty that he owed to CIA D.C.

**Statement of Facts**

**A.    French Caused CIA D.C. to be Organized Under the
        Laws of the District of Columbia**

6.    On February 7, 2003, Clark French and his wife, Mary French, caused CIA D.C.

to be incorporated under the laws of the District of Columbia by filing CIA D.C.'s Articles of

Incorporation with the District of Columbia Department of Regulatory and Consumer Affairs.

7.    Since its inception, French and his wife have been the only members of CIA

D.C.'s Board of Directors, French has been the President and Treasurer of CIA D.C., and Mary

French has been CIA D.C.'s secretary.

8.    In February, 2003, CIA D.C. issued 100 shares of common stock to French in

consideration for French's payment of $1,000 (or $10 per share).

**B.    CIA D.C. Hired Kime Based Upon Kime's Representation
That He Would Develop CIA D.C.'s Business**

9.    During the month of February 2003, Kime and French discussed the potential for
Kime to become involved in CIA D.C.'s business. Kime indicated during these conversations
that he could bring CIA D.C. numerous business opportunities and would help CIA D.C. develop
a strong client base.

10.    Based upon these representations, CIA D.C. offered Kime employment, which
Kime accepted. Kime was an at-will employee of CIA D.C. In addition, CIA D.C. offered Kime
an opportunity to invest in CIA D.C. by purchasing 100 shares of CIA D.C. common stock in
exchange for $1,000 (or $10 per share).

11.    On February 27, 2003, pursuant to a resolution passed at a special meeting of CIA
D.C.'s Board of Directors (the "February 27, 2003 Resolution"), CIA D.C. issued 1,000 shares
of common stock to Kime in exchange for $1,000. The February 27, 2003 Resolution was
signed by Mary French and CIA D.C.'s then only shareholder, Plaintiff French. The February
27, 2003 Resolution was also filed with CIA D.C.'s corporate minute book.

12.    Also, on February 27, 2003, CIA D.C., Kime and CIA D.C.'s only other
shareholder, French, entered into a Restrictive Stock Transfer Agreement (the "Stock
Agreement"), which limited French and Kime's ability to transfer their CIA D.C. stock. A true
and complete copy of the Restrictive Stock Transfer Agreement is attached hereto as Exhibit A
and is incorporated herein by reference.

C.    **Kime Receives an Advance on Profit Distributions and Submits Unauthorized Expenses for Reimbursement**

13.    Throughout the course of Kime's employment at CIA D.C., Kime was permitted to request advances of profit distributions and reimbursement for authorized business expenses from CIA D.C.

14.    Between March and November of 2005, Kime took a total of $51,000 in advances of his potential profit distributions (the "Advance"), which Kime would re-pay through deductions from future profit distributions for which Kime might otherwise be eligible. Implied in this agreement (the "Advance Agreement") was that Kime would continue to fulfill his duties as a CIA D.C. employee (and thus his ability to remain a shareholder) long enough to repay the advance. Thus, Kime had a duty to refrain from conduct that would give rise to termination of Kime's employment. It was also an implied term of the Advance Agreement that if Kime's employment was terminated prior to repaying the Advance, Kime would return the Advance upon termination.

15.    In addition, during the course of Kime's employment at CIA D.C., Kime was given a Capital One credit card that was in CIA D.C.'s name (the statement for which came directly to CIA D.C.) to use for business expenses such as CIA D.C. related travel and client entertainment expenses. Kime also used his personal American Express credit card for expenses, which expenses Kime sometimes submitted to CIA D.C. for reimbursement. To obtain reimbursement on the American Express card, Kime would submit his statement to the CIA D.C. accounting department with those items for which he sought reimbursement circled. Kime also used a transportation service, ABC Limo, that CIA D.C. would pay directly for charges arising from Kime's business related travel.

5

16.    On January 1, 2004, CIA D.C. implemented a "Travel and Expense Policy,"
which provides that CIA D.C. will reimburse employees for "travel and customer related
entertainment expenses" provided that such expenses are "directly related to company business."
The policy further provides:

1.    All expenses most [sic] be approved by the President of the company.
2.    All employees most [sic] fill out a company expense report and at a minimum detail out each expense item, its business purpose and list who was there, the amount and date.
3.    All expenses most [sic] be accompanied by a valid receipt showing the date, amount, and the vendor information.
4.    All expenses must be for legitimate business expenses.
5.    The company reserves the right to refuse to pay any expenses that it does not believe are appropriate.

17.    Relying on Kime's status as an owner of CIA D.C. (and thus that he would not
charge the company for expenses unrelated to CIA D.C. business), CIA D.C. did not
immediately review each expense that Kime submitted for the expense's relation to CIA D.C.
business. Kime was thus reimbursed for every expense that he submitted.

18.    CIA D.C. relied on Kime's submissions for reimbursement as a representation by
Kime that all expenses were legitimate expenses related to Kime's performance of his duties as a
CIA D.C. employee and thus "legitimate business expenses."

19.    However, upon reviewing the Capital One and American Express credit card
expenses for which Kime was reimbursed in 2005 and the supporting information related to
some of the ABC Limo charges, CIA D.C. discovered that Kime was reimbursed at least $34,816
for what was revealed to be Kime's personal expenses. This amount includes approximately
$13,083 for Kime's commuting expenses and $21,733 for personal expenses such as airline and
limo travel (and travel insurance) for Kime's wife (and at least one of Kime's wife's employees),
gas, groceries, wine and charges for dry cleaning. Kime was reimbursed additional amounts in

6

2003 and 2004, the propriety and amounts of which have not yet been determined. Because Kime himself incurred these expenses and made the submissions, Kime knew when he submitted these expenses for reimbursement or incurred the charges that they were personal expenses for which CIA D.C. should not reimburse him or for which CIA D.C. should not pay.

20.     In addition, Kime rented an apartment in the District of Columbia to serve as his residence while working in the District of Columbia. As an accommodation to Kime, CIA D.C. forwarded payment for the monthly rental charges to the landlord. At all times, Kime understood that such payment was made only as an accommodation, and that Kime was required to reimburse the company for this aspect of his personal living expenses. CIA D.C. paid at least $20,568 in rental charges for Kime's apartment, which Kime has never re-paid to CIA D.C.

**D.     Kime's Employment is Terminated and Kime Breaches the Restrictive Stock Transfer Agreement**

21.     On November 6, 2005, through a letter from CIA D.C.'s President, French, CIA D.C. terminated Kime's employment.

22.     Section 6 of the Stock Agreement, entitled "Cessation of Employment" provides, inter alia, that in the event a CIA D.C. shareholder's employment at CIA D.C. is terminated, the "Departing Stockholder" (here, Kime) immediately shall "offer all of his shares of Common Stock...first, to the Corporation [CIA D.C.], and, second, to the other Stockholders...." See Exhibit A at ¶ 6. Section 6 further provides that the purchase price shall be "Sixty Percent (60%) of the Agreed Value of the Shares," as defined later in the Stock Agreement. Id.

23.     Section 8 of the Stock Agreement provides that the "Agreed Value" of the CIA D.C. shares "shall be the per share dollar amount last agreed upon in writing by all of the Stockholders, which agreement shall be dated and filed with the minute book of the Corporation...." See Exhibit A at ¶ 8.

24.     Section 5 of the Stock Agreement, entitled "Transfer of Common Stock," provides the manner in which Kime, as the Departing Stockholder, shall offer his stock for sale, and the time limits for CIA D.C. and the remaining stockholder (French) to accept or reject Kime's offer. See Exhibit A at ¶ 5.

25.     The "the per share dollar amount last agreed upon in writing by all of the Stockholders, which agreement shall be dated and filed with the minute book of the Corporation...." or the "Agreed Value" of the shares is $10 per share, which was the original purchase price. This Agreed Value is evidenced by the February 27, 2003 Resolution, which is the most recent writing filed with the corporate minute book setting forth the value of the stock, which value was agreed upon by French, the only CIA D.C. shareholder stock at that time. In addition, Kime had notice that $10 per share was the most recent per share value agreed upon by the shareholders, as he was given a copy (or had access to) the resolution through which CIA D.C. issued Kime's shares at a value of $10 per share.

26.     Despite that Section 6 of the Stock Agreement required Kime to offer his CIA D.C. shares to the company and then to French "immediately upon the cessation" of Kime's employment at CIA D.C., Kime has failed and refused to comply with his obligations pursuant to the Stock Agreement. See Exhibit A at ¶ 6.

27.     In December 2005, CIA D.C.'s Board of Directors passed a resolution stating that CIA D.C. has determined that it would not be in CIA D.C.'s best interest to purchase Kime's shares and that the corporation thus declines to do so. CIA D.C.'s action thus obviates Kime's obligation to first offer his shares to CIA D.C. pursuant to Sections 5 and 6 of the Stock Agreement.

28.    After Kime's termination, French demanded that Kime comply with the Stock Agreement's requirements and that Kime offer his CIA D.C. stock for sale to French.

29.    Section 15(f) of the Stock Agreement provides that:

> In the event of a breach of this Agreement, any nonbreaching party hereto may maintain an action for specific performance against the party or parties hereto who are alleged to have breached any of the terms, conditions, representations, warranties, or agreements herein contained and it is hereby further agreed that no objection to the form of action in any proceeding for specific performance of this Agreement shall be raised by any party hereto so that such specific performance of this Agreement may not be obtained by the aggrieved party.

Exhibit A at ¶ 15(f).

## COUNT I
### (Breach of Contract) (asserted by CIA D.C.)

30.    CIA D.C. incorporates the allegations in paragraphs 1 through 29 as if fully set forth herein.

31.    In March through November, 2005, CIA D.C. agreed to give Kime $51,000 as an advance on future profit distributions.

32.    In exchange for the Advance, Kime impliedly agreed that he would continue to fulfill his duties as an employee of CIA D.C. (and thus his entitlement to be a CIA D.C. shareholder pursuant to the Stock Agreement) until the Advance was re-paid through deductions from future profit distributions.

33.    Pursuant to this agreement, Kime had a duty to refrain from conduct that would give CIA D.C. cause to terminate Kime's employment.

34.    In breach of this agreement, Kime took actions that necessitated CIA D.C.'s termination of Kime's employment (and thus his ability to remain a stockholder with the potential to receive profit distributions pursuant to the Stock Agreement).

35.     Kime's breach caused CIA D.C. to incur damages of at least the $51,000 that CIA D.C. advanced to Kime, but for which CIA D.C. has not been able to recoup through deductions from future profit distributions.

36.     In addition, CIA D.C. agreed to forward rental payments for Kime's District of Columbia apartment as an accommodation, and both parties understood that Kime was liable for reimbursing CIA D.C. these amounts.

37.     CIA D.C. paid at least $20,568 in rental charges for Kime's District of Columbia apartment.

38.     Kime breached the agreement by failing to re-pay CIA for the rental charges that it paid on Kime's behalf.

39.     CIA D.C. was damaged by the $20,568 that it advanced for rental charges for Kime's District of Columbia apartment.

## COUNT II
### (Breach of Fiduciary Duty) (asserted by CIA D.C.)

40.     CIA D.C. incorporates the allegations in paragraphs 1 through 39 as if fully set forth herein.

41.     As a 50% shareholder and employee of CIA D.C., CIA D.C. put Kime in a position of trust and confidence by permitting him to charge certain business related expenses to CIA, D.C. and permitting him to use the company credit cards. Kime thus owed CIA D.C. a fiduciary duty.

42.     Kime breached his fiduciary duty to CIA, D.C. by intentionally making material misrepresentations to CIA D.C. in the District of Columbia by submitting credit card statements to CIA D.C. for reimbursement and charging personal expenses to the company's accounts. By submitting the credit card statements for reimbursement or using the company's accounts, Kime

10

was representing that the items for which he sought reimbursement were legitimate, business related expenses. Kime intentionally misrepresented that these expenses were business related and subject to reimbursement.

43.    CIA D.C. reasonably relied on Kime's representations that the submissions were actual business related expenses and reimbursed Kime therefore or paid the amounts directly to vendors. CIA D.C. reimbursed Kime or paid directly to vendors at least $34,816 for these fraudulent expense submissions in 2005.

44.    On information and belief, CIA D.C. reimbursed Kime for additional illegitimate expenses in 2003 and 2004, which amounts have yet to be determined.

45.    CIA D.C. has been damaged by Kime's breach by at least the $34,816 that it reimbursed Kime or paid directly to vendors for these unauthorized, fraudulent expenses.

## COUNT III
### (Specific Performance)

46.    French incorporates the allegations in paragraphs 1 through 26 as if fully set forth herein.

47.    The Stock Agreement is a valid and enforceable contract between CIA D.C., Kime and French.

48.    Kime breached the Stock Agreement because immediately upon the termination of Kime's employment at CIA D.C., Kime failed to offer his CIA D.C. stock to CIA D.C., and upon CIA D.C.'s rejection of its opportunity to purchase the shares, Kime failed to offer his CIA D.C. stock to French.

49.    French has at all times been ready, willing and able to perform pursuant to the Stock Agreement and pay to Kime $600 as consideration for Kime's CIA D.C. stock.

11

50.    Despite demands and requests from French, Kime has failed and refused to tender his CIA D.C. stock as set forth in the Stock Agreement.

51.    Due to the unique character of the CIA D.C. stock, French is without an adequate remedy at law for Kime's breach.

WHEREFORE, Plaintiff Clark French respectfully requests that the Court enter judgment in his behalf and enter an order:

A.    Directing Kime to tender his shares of stock in Computer Intelligence Associates D.C. to French pursuant to the terms of the Agreement; and

B.    Such other relief as the Court deems just and proper.

In addition, Plaintiff CIA D.C. respectfully requests that the Court enter judgment in its behalf and enter an order:

C.    Awarding CIA D.C. its actual damages resulting from Kime's breach of fiduciary duty arising from his fraudulent expense reimbursements in an amount to exceed the $55,384 that CIA D.C. reimbursed Kime or paid directly to vendors in 2005; and

D.    Awarding CIA D.C. its actual damages arising from the $51,000 CIA D.C. advanced to Kime but for which CIA D.C. has not been repaid.

E.    Such other relief as the Court deems just and proper.

Dated: December ___, 2005

Respectfully submitted,

SHULMAN, ROGERS, GANDAL,
 PORDY & ECKER, P.A.

Ross D. Cooper #429200
11921 Rockville Pike, Third Floor
Rockville, MD 20852
(301) 230-5200
(301) 230-2891 (facsimile)

Attorneys for Plaintiff Clark French


HESSLER & ASSOCIATES CHARTERED

Stephen O. Hessler #230102
729 15th Street, N.W., Suite 200
Washington, D.C. 20005
(202) 393-8100
(202) 393-2104 (facsimile)

Attorneys for Plaintiff Computer
Intelligence Associates, Inc. D.C.


Jury Demand

Plaintiffs hereby demand a jury trial on all claims so triable.

Ross D. Cooper

Stephen O. Hessler

13