# RESTRICTIVE STOCK TRANSFER AGREEMENT

THIS RESTRICTIVE STOCK TRANSFER AGREEMENT (hereinafter referred to as the "Agreement") is made this 27 day of Feb, 2003, by and between CLARK D. FRENCH and ROY KIME (hereinafter sometimes individually referred to as a "Stockholder" and collectively as the "Stockholders") and COMPUTER INTELLIGENCE ASSOCIATES, INC., a District of Columbia corporation (hereinafter referred to as the "Corporation").

*Explanatory Statement*

A. The Corporation has authorized capital stock consisting only of Five Thousand (5000) shares of common stock (hereinafter referred to as the "Common Stock"), of which the following shares of the Common Stock are presently issued, outstanding and owned of record by the Stockholders as follows:

| Stockholders: | Shares: |
|---|---|
| CLARK D. FRENCH | 100 |
| ROY KIME | 100 |

B. The parties hereto believe it is desirable and in their mutual best interests to control the ownership of the Common Stock of the Corporation and thereby to help facilitate the continuous, harmonious and effective management of the affairs, policies, and operations of the Corporation.

C. It is the intention of the parties to restrict the transfer of all shares of the Common Stock of the Corporation and to provide a market for the sale of such shares upon the death of a Stockholder and upon the occurrence of certain other events, as provided hereinafter in this Agreement.

D. The Corporation recognizes that the loss of the services of any Stockholder would constitute a serious impairment to the effective conduct of its business and also might appreciably reduce the value of its goodwill.

E. The parties to this Agreement believe that its execution will serve as an inducement to the Stockholders to remain in the employ of the Corporation.

NOW, THEREFORE, in consideration of the Explanatory Statement and the mutual covenants, promises and agreements of the parties hereto, the parties hereto do hereby covenant, promise and agree as follows:

1. *Recitals.*

The Explanatory Statement is incorporated by reference in, and made a part of, this Agreement.

2. *Insurance.*

The Corporation shall have the right to make application for, take out and maintain in effect such policies of life insurance on the lives of, and such policies of disability insurance covering, any or all of the Stockholders, whenever and in such amounts as, in the opinion of the Board of Directors of the Corporation, such insurance may be required for the benefit of the Corporation. Each Stockholder shall exert his best efforts and fully assist and cooperate with the Corporation in obtaining any such policies of life and disability insurance.

3. *Purchase Upon Death.*

(a) Upon the death of any Stockholder (hereinafter referred to as the "Decedent"), the Corporation shall purchase and the Decedent's personal representatives shall sell all of the shares of Common Stock of the Corporation owned b the Decedent (hereinafter referred to as the "Decedent Shares") at the time of his death. The Corporation shall, by written notice addressed to the personal representative of the Decedent, fix a closing date for such purchase; the closing date shall not be less than ten (10) days after the appointment of such personal representative, but in no event longer than six (6) months after the date of death of the Decedent. The Corporation shall purchase the Decedent Shares on the closing date at a price per share (hereinafter referred to as the "Decedent Purchase Price") which shall be the Agreed Value of the Shares, as defined in Subsection 8.

(b) The aggregate dollar amount of the Decedent Purchase Price multiplied by the number of Decedent Shares owned by the Decedent at the date of death of the Decedent under this Section 3 shall be payable in cash on the closing date, unless the Corporation shall elect prior to or on the closing date to purchase the Decedent Shares in installments as provided in Section 9 hereof.

4. *Retirement and Disability.*

Upon the retirement or disability (hereinafter referred to as the "Termination") of a Stockholder (hereinafter referred to as the "Terminating Stockholder"), the Corporation shall purchase and the Terminating Stockholder shall sell, all of the shares of Common Stock of the Corporation (hereinafter referred to as the "Terminating Shares") owned by the Terminating Stockholder at the time of the Termination. The Corporation shall, by written notice addressed to the Terminating Stockholder, fix a closing date for such purchase which shall be not less than ten (10) days after the Termination, but in no event longer than forty-five (45) days after the Termination. The Terminating Shares shall be purchased by the Corporation on such closing date at a price per share (hereinafter referred to as the "Terminating Purchase Price") and in a manner as follows:

(a) The Terminating Purchase Price shall be the Agreed Value of the Shares, as defined in subsection 8.

(b) The aggregate dollar amount of the Terminating Purchase Price multiplied by the number of Terminating Shares owned by the Terminating Stockholder at the date of Termination under this Section 4 shall be payable in cash on the closing date, unless the Corporation shall elect prior to or on the closing date to purchase the Terminating Shares in installments as provided in Section 9 hereof.

(c) The "disability" of a Shareholder, for purposes of this Agreement, shall mean an illness, injury, or other physical or mental condition of the Stockholder occurring for a period of Six (6) consecutive months from the commencement of such condition which results in the Stockholder's inability to perform during such period substantially the obligations he performed in his capacity as an employee of the Corporation and to the extent he was performing same immediately prior to the commencement of such condition. If the Corporation and the Stockholder are unable to agree whether the Stockholder is disabled within the meaning of this Subsection 4(c), the issue shall be submitted to and settled by binding arbitration under and pursuant to the Maryland Uniform Arbitration Act and the rules and regulations of the American Arbitration Association, and the decision or award of the arbitrator or arbitrators in such arbitration shall be final, conclusive and binding upon each of the parties and judgment may be entered thereon in any court of

competent jurisdiction.

(d) The "retirement" of a Stockholder, for purposes of this Agreement, shall mean the resignation of a Stockholder at age sixty (60) or sooner; provided, however, that the Stockholder shall have been employed by the Corporation for a period of not less than ten (10) years prior to the date of retirement.

5. *Transfer of Common Stock.*

Except as otherwise provided in Sections 3, 4, 6 and 7 hereof, no Stockholder (hereinafter referred to as the "Offering Stockholder") shall, during the term of this Agreement, sell, hypothecate, pledge, assign, or otherwise transfer with or without consideration (hereinafter collectively referred to as a "Transfer") any or all of the shares of Common Stock of the Corporation owned of record or beneficially by him to any other person, corporation, partnership, association, trust or any other entity whatsoever (a "Transferee"), without first offering (hereinafter referred to as the "Offer") the shares of Common Stock subject to the contemplated transfer (hereinafter referred to as the "Offered Shares") first to the Corporation, and secondly, to the other Stockholders at a purchase price per share (hereinafter referred to as the "Transfer Purchase Price") and in a manner as follows:

(a) The Transfer Purchase Price shall be the Agreed Value of the Shares, as defined in Subsection 8.

(b)(i) The Offer shall be made by the Offering Stockholder first to the Corporation by written notice (hereinafter referred to as the "Corporate Notice"). Within twenty (20) days (hereinafter referred to as the "Corporate Offer Period") after receipt by the Corporation of the Corporate Notice, the Corporation shall notify the Offering Stockholder in writing (hereinafter referred to as the "Stockholder Notice"), whether or not the Corporation shall accept the Offer and shall purchase all but not less than all of the Offered Shares. If the Corporation accepts the Offer to purchase the Offered Shares, the Stockholder Notice shall fix a closing date not more than twenty-five (25) days (hereinafter referred to as the "Corporate Closing Date") after the expiration of the Corporate Offer Period.

(ii) In the event the Corporation decides not to accept the Offer, the

4

Offering Stockholder or the Corporation, at its election, shall, by written notice (hereinafter referred to as the "Remaining Stockholder Notice") given within that period (hereinafter referred to as the "Stockholder Offer Period") terminating ten (10) days after the expiration of the Corporate Offer Period, make the Offer of the Offered Shares to the other Stockholders, each of whom shall then have a period of twenty-five (25) days (the "Stockholder Acceptance Period") after the expiration of the Stockholder Offer Period within which to notify in writing the Offering Stockholder whether or not he intends to purchase all but not less than all of the Offered Shares (the "Stockholder Closing Date").

(c) The Transfer Purchase Price multiplied by the number of Offered Shares owned by the Offering Stockholder at the date of the Offer under this Section 5 shall be payable in cash on the Corporate Closing Date or on the Stockholder Closing Date, as the case may be, unless the Corporation or the purchasing Stockholders shall elect prior to or on the respective closing dates, to purchase such Offered Shares in installments pursuant to the provisions of Section 9 hereof.

(d) If the Corporation or the other Stockholders fail to accept the Offer, or, if the Offer is accepted but the Corporation or the other Stockholders fail to purchase all of the Offered Shares at the Transfer Purchase Price within the time and in the manner specified in this Section 5, then the Offering Stockholder shall be free, for a period (hereinafter referred to as the "Free Transfer Period") of sixty (60) days from the occurrence of such failure, to transfer the Offered Shares to a Transferee; subject only to any additional restrictions on such Transfer that may be imposed by this Agreement or any other agreement. Any such Transferee, upon acquiring the Offered Shares, shall automatically be bound by the terms of this Agreement and shall be required to join in, execute, seal and deliver a copy of this Agreement as a result of which he shall become an additional Stockholder party hereto. If the Offering Stockholder shall not transfer the Offered Shares within the Free Transfer Period, his right to transfer the Offered Shares free of the foregoing restrictions shall thereupon cease and terminate.

(e) Anything contained in this Section 5 to the contrary notwithstanding, the words "Transfer" or "transfer," as used in this Section 5 and elsewhere in this Agreement: (i) shall not include a gift or transfer by a Stockholder to, or for the benefit of, himself or a member of his immediate family or to any

personal trust in which the Stockholder or any member of his immediate family retains the entire beneficial interest; provided, however, that in the case of any such gift or transfer, the donee or Transferee shall hold the shares of Common Stock received in such transfer subject to the terms of this Agreement and shall be required to join in and execute and deliver a copy of this Agreement as an additional Stockholder party; and (ii) shall include the grant of any proxy, the establishment of any voting trust or any sale, hypothecation, pledge, assignment, or other conveyance, with or without consideration, of any incident or muniment of ownership or title as to any share of Common Stock owned of record or beneficially by a Stockholder, regardless of whether or not record or beneficial title to such shares is thereby transferred.

6. *Cessation of Employment.*

Immediately upon the cessation of employment with the Corporation (hereinafter referred to as the "Cessation") of a Stockholder (hereinafter referred to as the "Departing Stockholder") for any reason whatsoever and except as provided in Sections 3 and 4 hereof, the Departing Stockholder shall offer all of his shares of Common Stock (hereinafter referred to as the "Departing Shares") first, to the Corporation, and, second, to the other Stockholders at a purchase price per share (hereinafter referred to as the "Departing Purchase Price") and in a manner as follows:

(a) The Departing Purchase Price shall be Sixty Percent (60%) of the Agreed Value of the Shares, as defined in Subsection 8.

(b) The offer of the Departing Shares pursuant to this Section 6 shall be made by the Departing Stockholder upon the same terms and conditions, and in the same manner, set forth in Subsection 5(b) hereof in respect to the Offer.

(c) The Departing Purchase price multiplied by the number of Departing Shares owned by the Departing Stockholder at the date of Cessation shall be payable in cash on the closing date, unless the Corporation or the purchasing Stockholders shall elect prior to the closing date to purchase the Departing Shares in installments as provided in Section 9 hereof.

(d) If the Corporation or the other Stockholders shall fail to accept the offer of the Departing Shares, or if such offer is accepted and the Corporation

or the other Stockholders shall fail to purchase all of the Departing Shares at the Departing Purchase Price within the time and the manner specified in this Section 6, the Departing Stockholder shall be free to effect a Transfer of the Departing Shares to a Transferee free of the restrictions imposed by this Agreement but under the same terms and conditions as are set forth in Subsection 5(d) hereof in respect to the Offered Shares.

7. *Deadlock.*

(a) Upon the deadlock of the Board of Directors of the Corporation (hereinafter referred to as the "Deadlock"), as defined in Subsection 7(c), each Stockholder shall, within ten (10) days after the termination of the Deadlock Period, as defined in Subsection 7(c), submit to the Corporation a sealed bid (hereinafter referred to as the "Sealed Bid"), in writing, containing a price per share at which such Stockholder is willing to purchase all, but not less than all, of the issued and outstanding shares (hereinafter referred to as the "Deadlock Shares") of all classes of Common Stock of the Corporation owned by all the other Stockholders of the Corporation (hereinafter referred to as the "Deadlock Stockholders"). On the date of the expiration of such ten (10) day period (hereinafter referred to as the "Original Deadlock Closing Date"), the Sealed Bids shall be opened and the Stockholder submitting the Sealed Bid containing the highest price per share for the purchase of the Deadlock Shares shall purchase, and the Deadlock Stockholders shall sell to him at a price per share equal to that submitted in the Sealed Bid (hereinafter referred to as the "Bid Price") all, but not less than all, of the Deadlock Shares.

(b) The aggregate dollar amount of the Bid Price or Second Bid Price, as the case may be, multiplied by the number of shares owned by the Deadlock Stockholders at the date of Deadlock shall be payable in cash on the Original Deadlock Closing Date or the Second Deadlock Closing Date, as the case may be, unless the purchasing Stockholder shall elect prior to or on the respective closing date to purchase such Deadlock Shares on an installment basis pursuant to the provisions of Section 9 hereof.

(c) The "deadlock" of the Board of Directors of the Corporation, for purposes of this Section 7, is hereby defined as being where the Directors are so divided respecting the management of the Corporation's affairs that the votes required for action by the Board cannot be obtained for a continuous period equal to or exceeding ninety (90) days (referred to throughout this

7

Agreement as the "Deadlock Period").

8. *Agreed Value.*

"Agreed Value" as used in this Agreement shall be the per share dollar amount last agreed upon in writing by all of the Stockholders, which agreement shall be dated and filed with the minute book of the Corporation and shall be in the form as set forth in **Schedule A** which is attached hereto and incorporated by reference herein.

9. *Installment Payments.*

(a) In the event there shall be an election by the Corporation or the other Stockholders pursuant to the provisions of Subsections 3(b), 4(b), 5(c), 6(c) or 7(b) hereof to purchase the Decedent Shares, the Terminating Shares, the Offered Shares, the Departing Shares or the Deadlock Shares, as the case may be, (hereinafter, where appropriate, referred to as the "Shares"), on an installment basis, then the terms and conditions of such installment purchase shall be as follows:

(i) twenty-five percent (25%) of the aggregate purchase price due for such Shares (hereinafter, where appropriate, referred to as the "Aggregate Purchase Price") shall be paid on the closing date; and

(ii) the remainder of the Aggregate Purchase Price shall be paid in equal annual installments on each anniversary of the closing date over a period, beginning with the year following the fiscal year of the Corporation in which the sale occurred, not to exceed five (5) years (hereinafter referred to as the "Installment Payment Period"); and,

(iii) the Corporation or the other Stockholders, as the case may be, shall pay simple interest at the rate of Six and One Half percent (6.5%) per annum on the unpaid balance of the Aggregate Purchase Price on each anniversary of the closing date during the Installment Payment Period.

(b) So long as any part of the Aggregate Purchase Price incurred in accordance with this Agreement remains unpaid, the Corporation:

(i) shall not, without the consent of the Decedent's personal

8

representatives, the Terminating Stockholder, the Offering Stockholder, the Departing Stockholder or the Deadlocking Stockholders, as the case may be (hereinafter, where appropriate, referred to as the "Payee"), declare or pay dividends on its capital stock, make any distributions with respect to its capital stock, enter into a share exchange with any other corporation, merge or consolidate with any other corporation, sell any of its assets in excess of ten percent (10%) of the total value of the Corporation's assets, except in the regular course of business, or increase the salary or other compensation of any officer, director or stockholder of the Corporation in excess of Twenty-Five Percent (25%) of the salary or the compensation payable to such officer, director or stockholder of the Corporation during the immediately preceding fiscal year of the Corporation (otherwise than by a prior written employment agreement between the Corporation and such person); and

(ii) shall permit the Payee and his attorneys or accountants to examine the books and records of the Corporation during regular business hours from time to time upon reasonable prior written notice and to receive copies of the annual accounting reports and tax returns of the Corporation.

(c) In the event that during the Installment Payment Period in the case of a Termination, Cessation or Deadlock pursuant to Subsection 7(a) hereof, the Terminating Stockholder, the Offering Stockholder, the Departing Stockholder shall become deceased, then the terms of payment and the Installment Payment Period shall be and remain those elected at the respective closing date of said Termination, Offer, Cessation or Deadlock.

10. *Endorsements of Stock Certificates.*

Upon the execution of this Agreement, the certificates representing shares of Common Stock subject to this Agreement shall be conspicuously legended as follows:

> "The shares of stock represented by this Certificate are restricted as to transfer by the terms, conditions and covenants of an Agreement with respect thereto dated the         day of
>         , 2002, a copy of which is on file with the Corporation. The Corporation will gratuitously furnish a copy of said Agreement to any party having a valid interest therein. Any transfer of stock other than in accordance with said Agreement shall be absolutely

null and void."

11. *Stock Issued In The Future.*

Before any additional shares of Common Stock of the Corporation are issued in the future to any person, corporation, partnership, association, trust and/or any other entity whatsoever other than a signatory to this Agreement, such person or entity shall be required to become a party to and execute and deliver a copy of this Agreement prior to the issuance of such shares of Common Stock to him, and the certificates therefore shall be legended as provided in Section 10 of this Agreement.

11. *After-Acquired Stock.*

Whenever any Stockholder acquires any additional shares of Common Stock of the Corporation other than the shares of Common Stock owned at the time of the execution of this Agreement, such shares of Common Stock of the Corporation so acquired shall be subject to all of the terms of this Agreement, and the certificates therefore shall be surrendered to the Corporation for legending in accordance with Section 10 of this Agreement, unless already so legended.

12. *Termination.*

This Agreement shall be perpetual until the happening of any of the events listed below, upon the first to occur of which all rights and obligations, and rights and obligations respecting the payments pursuant to Subsections 3 (b), 4 (b), 5 (c), 6 (c) and 7 (b) hereof shall cease:

(a) the agreement in writing of holders of the outstanding shares of Common Stock to terminate this Agreement;

(b) the adjudication of the Corporation as a bankrupt, the execution by the Corporation of an assignment for the benefit of creditors or the appointment of a receiver for the Corporation;

(c) the voluntary dissolution of the Corporation; or

(f) in the event there is a merger, consolidation or show exchanges

whereby the Corporation is not the surviving or successor corporation, as the case may be.

13. *Notices.*

All notices, offers, acceptances, exercises of options, waivers and other acts under this Agreement shall be in writing and shall be deemed to have been duly given when delivered in person or mailed by first class, certified mail, postage prepaid, or by cable, telex, or telegram and addressed to the Corporation as follows: c/o Clark D. French, 10015 Old Columbia Road, Suite B 215, Columbia, Maryland 21046 or to the Stockholders at their addresses as shown below, or to such other addresses as any of them, by written notice to the others, may from time to time designate. Except as otherwise provided in this Agreement, time shall be counted from the date of such delivery or mailing.

14. *Additional Actions And Documents.*

Each of the parties hereto agrees to take or cause to be taken further actions, to execute and deliver or cause to be executed and delivered such further instruments and to use his best efforts to obtain such requisite consents as any other party may from time to time reasonably request in order to fully effectuate the purposes, terms and conditions of this Agreement.

15. *Miscellaneous.*

(a) This instrument contains the entire agreement among the parties and supersedes all prior oral or written agreements, commitments or understandings with respect to the matters provided for herein, and no modification shall be binding upon the party affected unless set forth in writing and duly executed by each party affected.

(b) Each of the Stockholders represent and warrant that he is the sole owner of the number of shares of the Common Stock set forth opposite his signature hereto, evidenced by the certificate number or numbers shown immediately after such number of shares, that all of such shares are free and clear of all liens, claims, charges, security interests, or encumbrances of any kind, and that he has the right and lawful authority to sell or otherwise transfer such shares.

(c) All of the covenants and agreements in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of their respective heirs, guardians, personal and legal representatives, successors and assigns.

(d) This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of Maryland.

(e) In the event that one or more of the provisions of this Agreement shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

(f) In the event of a breach of this Agreement, any nonbreaching party hereto may maintain an action for specific performance against the party or parties hereto who are alleged to have breached any of the terms, conditions, representations, warranties, or agreements herein contained and it is hereby further agreed that no objection to the form of action in any proceeding for specific performance of this Agreement shall be raised by any party hereto so that such specific performance of this Agreement may not be obtained by the aggrieved party. Anything contained herein to the contrary notwithstanding, this Subsection 15(f) shall not be construed to limit in any manner whatsoever any other rights and remedies an aggrieved party may have by virtue of any breach of this Agreement.

(g) The descriptive headings of the several sections and paragraphs of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

(h) Unless the context otherwise requires, whenever used in this Agreement, the singular shall include the plural, the plural shall include the singular, and the masculine gender shall include the neuter and feminine gender, and vice-versa.

(i) This Agreement may be executed in counterparts, each of which shall be an original, but all of which shall together constitute one document.

IN WITNESS WHEREOF, the parties have hereunto set their hands and

seals and acknowledged this Agreement as of the date first above written.

|  | No. of Shares Owned | Certificate No.(s) |
|---|---|---|
| _(signature)_ (SEAL)<br>CLARK D. FRENCH | 100 | 1 |
| _(signature)_ (SEAL)<br>ROY KIME | 100 | 2 |

ATTEST:                                           COMPUTER INTELLIGENCE ASSOCIATES, INC.

_(signature)_                              By: _(signature)_ (SEAL)
MARY E. FRENCH, Secretary              CLARK D. FRENCH, President

F:\PLEAD\RESTC001.COM

13