**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

CLARK FRENCH, et al.

Plaintiffs/Counterdefendants

v.

ROY KIME

Defendant/Counterplaintiff

Case Number 1:05CV02448-RMU

**DEFENDANT/COUNTERPLAINTIFF'S OPPOSITION TO PLAINTIFFS/COUNTERDEFENDANTS' MOTION TO DISMISS COUNTS I-Ill AND VI-IX OF THE COUNTERCLAIM IN THEIR ENTIRETY AND TO DISMISS COUNTS IV AND V OF THE COUNTERCLAIM IN PART AND COUNTER-DEFENDANTS' MOTION TO STRIKE PARAGRAPHS 28,30,31,32,33 AND 35 OF THE COUNTERCLAIM**

Defendant/Counterplaintiff Roy Kime ("Kime") hereby opposes Plaintiffs/ Counterdefendants' Motion to Dismiss, Motion to Dismiss in Part and Motion to Strike on the following grounds:

**Introduction**

Counterdefendants motion is based solely on Fed.R.Civ.P. 12(b) and (f). Accordingly, the motion is addressed to the sufficiency of the allegations on the face of the Counterclaim, all of which must be taken as true and construed in a light most favorable to Counterclaimant Kime. Nevertheless, Counterdefendants have included a Statement of Facts in their motion that includes allegations that are not supported by the

pleadings and which call upon the court to resolve disputed issues in Counterdefendants' favor.

For example, Counterdefendants claim that Kime admits in paragraph 10 of the Counterclaim that French was the "only shareholder" at the time he was issued his 1000 shares of common stock. Motion at 3. Counterdefendants make this claim in order to bolster their argument that French, in his capacity as a stockholder, agreed to the original subscription price for Kime's shares. Paragraph 10 makes no such admission, however, and Kime alleges elsewhere that CIA-DC set the subscription price at $10 per share for both Kime and French by Board resolution on the same day (February 27, 2003) and that neither French nor Kime was a stockholder when the original subscription price of the stock was determined. Counterclaim ¶ 10, 20. Counterdefendants also assert as a matter of fact that the "Agreed Value" of Kime's shares for the purpose of the Restrictive Stock Transfer Agreement was determined pursuant by the February 27 Board resolution. Motion to Dismiss at 5. This is a contested issue in this case and this assertion is not supported by the Counterclaim and certainly is not the only possible inference to be drawn from it. Counterdefendants also slant the facts to create the impression that French "sold" Kime his 50% ownership in CIA-DC merely as an incentive of his employment order to downplay the fact that French and Kime were both equal initial investors in the start-up company. Motion at 4. Again, this is not supported by the Counterclaim and calls upon the court to make findings of fact in Counterdefendants' favor.

In addition, the Statement of Facts contains a lengthy footnote, unsupported by any evidence, to the effect that Kime's allegation that CIA-DC owned the software known as Intelligov is without merit. Motion at 6 n.4. Again, the assertions in this

footnote concern contested issues and Kime denies them. A Rule 12(b)(6) motion is not the proper means for resolving disputed issues of fact. Counterdefendants' Statement of Facts have no bearing on issues properly presented by a Rule 12(b)(6) motion and should be disregarded.

**ARGUMENT**

**I. Count I States a Claim for Breach of Fiduciary Duty.**

Counterdefendants assert that Count I fails to state a claim for breach of fiduciary duty because the claim is prefaced on the Restrictive Stock Transfer Agreement and, therefore, sounds in contract rather than in "tort." Counterdefendants cite no authority, however, for the proposition that a claim based on the fiduciary duty of one shareholder to another does not exist simply because the manner in which defendant shareholder is violating that duty involves the bad faith manipulation of a contractual obligation to force the plaintiff shareholder out of the corporation and deprive him of the value of his stock.[1] Counterdefendants' cases are inapposite. In *Kann v. Kann*, 344 Md. 689, 713 (Ct. App. 1997), the court simply held that there is no omnibus tort for the redress of fiduciary duties by any and all fiduciaries. Whether or not a particular breach of fiduciary duty is also a tort has nothing to do with whether or Count I states a claim for breach of fiduciary duty. In *Vinogradova v. Suntrust Bank, Inc.*, 162 Md. App. 495, 505, 875 A.2d 222, 228 (Ct. Spec. App. 2005), the court simply held that a bank did not have a fiduciary duty to the plaintiff to warn her that another individual was depleting her accounts when she had given him a broad power of attorney to withdraw and transfer account assets which included a statement that third parties would be fully protected in relying on it.

---

[1] The Counterclaim alleges that French terminated Kime for the purpose of triggering the requirement in Restrictive Stock Transfer Agreement that Kime sell his interest in the corporation and then engaged in bad faith acts designed to force Kime to sell his stock to French for a pittance.

Counterdefendants do not suggest that shareholders do not have a fiduciary duty to other shareholders. Counterdefendants' citation to *Kann* for the additional proposition that Maryland has not adopted a theory that would transform a breach of contract into a tort is also inapposite. Breach of fiduciary duty is not a tort. Accordingly, Counterdefendants have offered no grounds on which to dismiss Count I.

## II. Count II States a Claim for Breach of Directors' Fiduciary Duty to Shareholder.

Counterdefendants allege that Count II does not state a claim because, since it is based, in part, on a resolution by the CIA-DC Board of Directors that CIA-DC would not purchase Kime's stock "pursuant to CIA-DC's rights under the [Restrictive Stock Transfer] Agreement," the claim is actually one for breach of contract that Kime is attempting to convert into a tort. This makes no sense. Kime alleges that the French's passed the resolution so that Kime would have to offer his shares to French, personally, who was attempting to buy them from Kime for well below their value. The resolution itself cannot be characterized as a breach of contract; it merely obviated Kime's obligation to offer his shares to CIA-DC first. *See* Counterclaim ¶ 15.

Counterdefendants also assert that Count II does not state a claim because the Directors' decision that it was not in the best interest of CIA-DC to purchase the stock is entitled to deference and Kime does not allege that it was, in fact, in CIA-DC's interest to purchase the stock. Counterdefendants cite no authority, however, for the proposition that proving that purchasing Kime's stock *would* be in the best interest of the corporation is a necessary element of his fiduciary duty claim. Whether or not it would have been in CIA-DC's best interest to purchase the stock has no bearing on his claim against the Directors' for breach of fiduciary duty because Kime is not basing this claim on CIA-

DC's failure to purchase the stock. Rather, he alleges that the Directors entered into the resolution for the purpose of enabling French to force Kime to sell his shares for $600. To the extent corporate interest bears on this claim, a resolution for that purpose obviously is not in the interest of the corporation. Accordingly, Counterdefendants have offered no grounds on which to dismiss Count II.

## III. Count III of the Counterclaim States a Claim for Breach of the Covenant of Good Faith and Fair Dealing Under Maryland Law.

In support of their motion to dismiss Count III of the Counterclaim, Counterdefendants appear to be saying that Maryland does not recognize any implied rights in a contract, so that a contract places no obligation on a party that is not expressly stated in it. Specifically, Counterdefendants claim that they have no obligation to agree on a "reasonable valuation" of Kime's shares in CIA-DC because the plain language of the contract does not require it. Motion to Dismiss at 11-12. Counterdefendants' statement of Maryland law is incorrect.

The law in Maryland is that, in every contract, "there exists an implied covenant that each of the parties thereto will act in good faith and fairly with the others." *Julian v. Christopher*, 320 Md. 1, 9, 575 A.2d 735, 739 (Md. Ct. App. 1990), citing *Food Fair v. Blumberg*, 234 Md. 521, 534, 200 A.2d 166, 174 (1964). *Accord Eastern Shore Markets, Inc. v. J.D. Associates*, 213 F.3d 175, 182, 185 (4th Cir. 2000) (Maryland clearly recognizes implied covenant of good faith and fair dealing). In *Eastern Shore Markets*, the Court of Appeals for the Fourth Circuit concluded that the covenant of good faith and fair dealing as recognized in Maryland includes prohibiting a party from acting in such a manner as to prevent the other party from performing and, in certain circumstances, prohibiting a party from engaging in destructive competition with the other. 213 F. 2d at

182-83. The Court for Appeals stated that, in determining the application of the covenant, Maryland has turned to "the intention with which the parties entered into the contract, as expressed in the contract, construed in the light of the circumstances in which the contract was made." 213 F.2d at 183. The Court noted that, while the covenant of good faith and fair dealing in Maryland has been held not to impose new, affirmative obligations about which the contract is silent, it *does* operate to recognize conditions inherent in express terms. 213 F.3d at 184. *Accord 7-Eleven, Inc. v. McEvoy*, 330 F. Supp. 2d 352, 360 (D. Md. 2004). For example, a promisor who agrees to pay for a business with the profits of the business has an inherent obligation to exercise reasonable diligence in continuing to conduct the business. Likewise, a promisor who undertakes to distribute the products of the promisee impliedly agrees to exercise best efforts, and a promisor who undertakes to exercise judgment on behalf of a promisee impliedly agrees to exercise good judgment. 213 F.3d at 184. Consistent with the Court of Appeals' summary of Maryland law, the Maryland Court of Appeals held in *Julian v. Christopher* that, where a lease gave the lessor the right to consent to a sublease but did not spell out any standard for withholding consent, the implied covenant required that the landlord's discretion "should be exercised in good faith" and imposed a "reasonableness standard" on withholding consent. 330 Md. at 9, 575 A.2d at 739. In *7-Eleven*, the U.S. District Court for the District of Maryland held that, where 7-Eleven had the discretion to determine if and when it would renovate its stores, it had to exercise that discretion reasonably and a jury could find that it unreasonably exercised its discretion in failing to renovate the plaintiff's decrepit store. 330 F. Supp. 2d at 360. It also held that 7-Eleven had an implied obligation not to frustrate the plaintiff's performance under the franchise

agreement. *Id*. at 361-62. *See also P.V. Properties, Inc. v. Rock Creek Village Assocs.*, Ltd., 77 Md. App. 77, 87, 549 A.2d 403, 408 (Md. Ct. Spec. App. 1988) (landlord had implied contractual duty to disclose to tenant its cost data and basis on which tenants common area maintenance liability is computed).

Similarly, in this case, the Restrictive Stock Transfer Agreement expressly provides that Kime is required, upon cessation of his employment, to offer his shares to CIA-DC or CIA-DC's other shareholder(s) at the "per share dollar amount last agreed upon in writing by all of the Stockholders." Counterclaim ¶¶ 15-16. The above line of authority clearly demonstrates that, contrary to Counterdefendants' argument, Maryland *will* recognize the implied obligation to implement this provision reasonably and in good faith.

Neither of the cases on which Counterdefendants rely is to the contrary. In *Baker v. Sun Co.*, 985 F. Supp. 609 (D. Md. 1997), the district court acknowledged that Maryland recognizes that every contract imposes a duty of good faith and fair dealing in its performance but rejected the plaintiff's claim in that case because Maryland has not recognized an "*independent*" cause of action for breach of the implied covenant. *Id*. (emphasis supplied). The plaintiff, a franchisee, alleged that the franchisor breached the implied covenant by unreasonably closing the franchisor's gas station for construction and improvement knowing that two-low cost competitors would open in the immediate vicinity in the meantime, resulting in financial loss to the franchisor. There was no indication in the decision that the plaintiff based this claim on any reasonable expectation or understanding inherent in the express terms of the franchise agreement. Likewise, in *Parker v. The Columbia Bank*, 91 Md. App. 346 (1992), the Maryland Court of Special

Appeals recognized the implied covenant, but refused to apply it to place an obligation on a bank to take affirmative action it was clearly not required to take under its loan agreement with the plaintiffs for the construction of their house. Specifically, the plaintiffs alleged that the bank breached an implied covenant in its loan agreement by disbursing monies to the building contractor without determining that the work covered by each draw had actually been completed. 91 Md. App. at 366-67. Neither of these cases concerns a claim, like the one here, that is grounded in express contract terms. Accordingly, Count III of the Counterclaim states a claim for breach of the covenant of good faith and fair dealing and should not be dismissed.

## IV. Counts IV and V Both State a Derivative Claim for Breach of Fiduciary Duty.

Counterdefendants assert that Kime has no standing to assert a derivative claim on behalf of CIA-DC in Counts IV and V of the Counterclaim because he is not a shareholder of CIA-DC. Counterdefendants assert that Kime admitted that he is no longer a shareholder in the Counterclaim and that he is no longer a shareholder pursuant to the terms of the Restrictive Stock Transfer Agreement. Motion at 14. To the contrary, there is nothing in the Counterclaim that suggests that Kime is no longer a shareholder. Rather, Kime alleges in the Counterclaim that "At all times material to this action, and continuing to the present day, Roy Kime has been and is a shareholder of CIA-DC." Counterclaim ¶ 47. *See also* Counterclaim ¶ 2 (Kime is a fifty percent shareholder of CIA-DC). Counterdefendants' motion to dismiss Counts IV and V is really based on their assertion that, pursuant to the Restrictive Stock Transfer Agreement, Kime's ownership ceased immediately upon the cessation of his employment. The plain language of the Agreement does not support this assertion. By Counterdefendants' own

description, the Agreement merely requires Kime to "*offer*" his stock at 60% of the value of the shares as agreed-upon by all of the stockholders. Counterclaim ¶ 16. According to the Counterclaim, the sale could not be consummated because no such agreement was reached. At best, Counterdefendants' argument presents a disputed issue of contract interpretation and of the intent of the parties that is not appropriate for resolution on a Rule 12(b)(6) motion.

Counterdefendants also appear to assert that Count IV should be dismissed as to Mary French because there is no allegation that she participated personally in diverting assets from CIA-DC to CIA-MD. To the contrary, the Counterclaim does allege that Mary French, as one of only two Directors of CIA-DC, acquiesced in, assisted and facilitated the diversion of assets to CIA-MD for her personal benefit and the personal benefit of her husband, (the other Director). Counterclaim ¶¶ 45, 46, 48. This is sufficient to meet the pleading requirements. Accordingly, Counterdefendants have presented no grounds justifying dismissal of Counts V and VI.

In addition, it should be noted that Counts V and VI also assert non-derivative claims on behalf of Kime individually on the basis that he suffered a unique harm that is not shared by other CIA-DC stockholders. Counterclaim ¶¶ 67 and 72. The motion to dismiss is not directed to the individual claims.

## V. Count VI States a Claim for Abuse of Process.

Counterdefendants contend that Count VI fails to state a claim for abuse of process against the French's because Mary French was not a party to the Complaint and, relying on *Bown v. Hamilton*, 601 A.2d 1074, 1080 (D.C. App. 1992), that Kime does not allege that process was abused after the suit was initiated to achieve an end that is not

contemplated by the regular prosecution of the charge. Motion to Dismiss at 16. Although Mary French was not a party to the original complaint, this is not an element of an abuse of process claim. Moreover, she is an officer and director of CIA-DC, which is a party to the Complaint.

Moreover, *Bown* does not compel dismissal of Count VI. *Bown* holds that "ulterior motive" alone is not sufficient to state a claim for abuse of process. Rather, the plaintiff must show that the process was used to accomplish an end not regularly or legally obtainable. The distinction between the two is not easy to discern. In *Bown* itself, the plaintiffs alleged only that her landlord filed a suit for possession to deprive the plaintiffs of their option to rent the basement apartment." Id. The court relied on another decision in which the plaintiffs merely alleged that the defendant had filed a counterclaim to force a settlement of their claim against him. *Id*. Here, in contrast, Kime alleges that Counterdefendants' suit against him for expense account improprieties and for "specific performance" of his alleged obligation to sell Clark French his CIA-DC shares for $600 was designed to force him to do something he could not legally be required to do: sell his shares to French for $600 dollars. Thus, unlike in *Bown*, French's alleged unlawful purpose appears on the face of the Complaint. Accordingly, Kime submits that this case is distinguishable from *Bown* and Count VI does state a claim for abuse of process. If the Court disagrees, Kime requests that the court dismiss the claim without prejudice to amendment or refiling when the facts have ripened into a cognizable claim.

**VI. Count VII States a Claim for Civil Conspiracy.**

Counterdefendants allege that Count VII fails to state a claim against the French's for civil conspiracy because it merely alleges in conclusory fashion that they "combined

and conspired" and does not allege that Kime suffered actual injury. Motion to Dismiss at 17. Counterdefendants rely on *Brady v. Livingood*, 360 F. Supp. 2d 94, 104 (D.D.C. 2004), in which the court stated that an employment discrimination plaintiff cannot state a claim for civil conspiracy simply by reciting the alleged wrongs against him and alleging that the defendants "agreed among themselves to subject him to discriminatory acts." Rather, the plaintiff had to "put forth facts suggesting that the defendants were acting in concert in furtherance of a shared goal." *Id*.

Whether or not Kime adequately alleges a claim for civil conspiracy is not determined simply by looking at the allegations in paragraphs 79 and 80 of the Counterclaim, but in reference to the entire Counterclaim. Taken as true, the entire Counterclaim establishes that Clark and Mary French are husband and wife, Clark and Mary French are the only Directors of CIA-DC, Clark French is the President and Treasurer of CIA-DC and Mary French is the Secretary of CIA-DC, Clark French and Mary French signed a memorandum as Directors of CIA-DC stating a value for Kime's shares of $1000 per share and later passed a resolution that CIA-DC would not purchase Kime's shares, Clark French and Mary French are the sole legal and beneficial owners of CIA-MD, and that eliminating Kime as a shareholder of CIA-DC at a cost of $600 and transferring assets from CIA-DC to CIA-MD personally benefits both. Counterclaim ¶¶ 5, 6, 8, 9, 31, 37, 45, 46, 57, 58, 66, 68, 71, 73, 77, 80, 86. Counterdefendants do not claim that Kime cannot state a claim unless he can recite direct evidence that the Frenchs' had an agreement. Kime submits that the allegations cited above are more than sufficient to *suggest* that defendants were acting in concert in furtherance of a shared goal and satisfy the pleading requirement.

Counterdefendants also assert that Kime fails to state a claim because he does not allege that he has been injured. To the contrary, Kime alleges throughout the Counterclaim that Counterdefendants' conduct has diminished and continues to diminish the value of his ownership interest in CIA-DC. Since French will not cooperate in valuing this interest, Kime seeks an accounting and an appraisal to determine the value of his interest in CIA-DC at the time of his termination from employment and to what extent this value has been diminished by the transfer of assets to CIA-MD. Kime submit that this is sufficient to satisfy any pleading requirement that he allege actual injury. Accordingly, Counterdefendants have presented no grounds justifying dismissal of Count VII.

**VII. Count VIII States a Claim for Violation of the District of Columbia Uniform Trade Secrets Act.**

Counterdefendants contend that Count VII does not state a claim for misappropriation of a trade secret under the D.C. Uniform Trade Secrets Act because Kime does not specifically allege that "the source code for the software known as Intelligov is subject to a confidentiality agreement or other measures to protect its secrecy and confidentiality from French or CIA-MD." Motion to Dismiss at 18. The case on which Counterdefendants rely for this proposition does not address the sufficiency of a pleading however, but cross motions for summary judgment. To the extent the decision purports to set out the elements of a misappropriation claim, it stands for the proposition that simply alleging, as Kime does here, that the information is a "trade secret" is sufficient. *Catalyst & Chemical Servs., Inc. v. Global Ground Support*, 350 F. Supp. 2d 1, 7-8 (D.D.C. 2004). This makes sense because the term trade secret under the Act

*means* information that is "subject to reasonable efforts to maintain its secrecy." D.C. Code § 36-401(4).

Counterdefendants also appear to argue that Kime's Counterclaim undercuts his claim that that Intelligov "belonged solely to CIA-DC." Motion to Dismiss at 19. Contrary to Counterdefendants' argument, however, Kime does not allege that employees from both CIA-DC and CIA-MD "designed" the software. Motion to Dismiss at 19. Kime alleges that employees *from CIA-DC designed the Intelligov software* with "support" from a low level programmer employed by CIA-MD and an independent contractor consultant to CIA-MD. This does not contradict Kime's allegation that CIA-DC owns the software. Counterdefendants' reliance on *Physiotherapy Assocs., Inc. v. White*, 2006 WL 545542 * 6-8 (N.D. Ind. 2006), for this portion of its argument is misplaced. That case merely stands for the general proposition that an employee's knowledge of the identity of customers based on his work contact with them - as distinguished from a customer list - is not a trade secret. It has nothing to do with ownership of trade secret information, the requirements for pleading a misappropriation claim or even the meaning of "reasonable measures" taken to protect confidentiality.

To the extent Counterdefendants are trying to argue that Intelligov may be appropriated at will by CIA-MD based on Kime's allegation that two CIA-MD employees assisted in its development, that is not the law. An owner is not required to maintain absolute secrecy to retain trade secret protection. *Catalyst*, 350 F. Supp. 2d at 10. Disclosure of information between, for example, two entities engaged in a business venture, does not forfeit trade secret protection if the information is disclosed in confidence, "express or implied." *Id*. at 10-11.

Counterdefendants' remaining argument appears to be that Kime does not state a claim because he does not allege that CIA-MD or any other counterdefendant disclosed the Intelligov source code to a *third party*. Motion to Dismiss at 19. This is simply another way of saying that there can be no violation of the UTSA if the violation is between two corporations who share the same officers and directors. The Act is not so limited. Rather, as alleged in the counterclaim, it prohibits the unauthorized disclosure or *use* of a trade secret that is "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." D.C. Code 36-401(2). Accordingly, Counterdefendants have presented no grounds justifying dismissal of Count VIII.

**VIII. Count IX States a Claim Under the Wage Payment and Collection Law.**

Counterdefendants essentially argue that Count IX does not state a claim under the D.C. Wage Payment and Collection Law ("WPCL") because Kime admits that Clark and French and Mary French are not his employers and that he was a bona fide executive. Counterdefendants claim that the WPCL defines employer as "an individual … corporation" is not correct. The statute states that "employer" *includes* "every individual, partnership, firm, association, corporation, [etc.] employing any person in the District of Columbia." D.C. Code § 32-1301(1). Whether or not an individual rather than a corporation is the employer is an issue of fact. *See Sanchez v. Magafan,* 892 A.2d 1130 (D.C. App. 2006). The Counterclaim alleges sufficient facts to support the conclusion that Kime was, in fact, employed by the French's individually because they were the alter egos of the corporation. The Counterclaim alleges facts supporting the conclusion that that the French's exercised complete *de facto* control over the corporation and did not respect the corporate form. Under the circumstances, Kime's assertion that he was paid

by the corporation (Counterclaim ¶ 23) and that the French's permitted him to render services as "an employee of CIA-DC" (Counterclaim ¶ 89) insufficient to negate a claim under the WPCL.

Counterdefendants assert that Kime's allegations in his Answer that he was a Chief Executive Officer for CIA-DC conclusively establish that he is not covered by the WPCL because he is a "bona fide executive." D.C. Code § 32-1301(2). All Kime admitted, however, was that Clark French proposed to him that he "have the title" of Chief Executive Officer. Answer ¶ 10. There are no allegations in the Counterclaim regarding Kime's duties. Contrary to Counterdefendants' argument, Kime did not assert that he was not an employee within the meaning of the expense policy because he was a CEO. Rather, he did so because he was a "half-owner of the corporation." Answer ¶16.[2] Kime's title alone does not establish that he was a "bona fide executive." *Fudali v. Pivotal Corp.*, 310 F. Supp. 2d 22, 24-27 (D.D.C. 2004). Whether or not Kime is a "bona fide executive" is an issue of fact that cannot be resolved at the pleading stage. *Id.* Accordingly, Counterdefendants have not presented sufficient grounds to dismiss Count IX.

## IX. Kime's Allegations Regarding Counterdefendant French's Position on the Value of His Stock Are Not Excludable From Evidence Pursuant to Fed.R.Evid. 408.

Counterdefendants move to strike certain allegations in the Counterclaim pursuant to Fed.R.Evid. 408 on the ground that they constitute settlement discussions as to the amount "Kime should be paid for his stock." Motion to Dismiss at 21. In order to be

[2] In fact, the Complaint and Answer demonstrate that the extent of Kime's actual duties and authority is a disputed issue. Counterdefendants admit that Kime was employed "to provide front end business development and recruitment" but *deny* that he was offered the title of Chief Executive Officer. Counter-Defendants' Answer to Counterclaim ¶ 22.

inadmissible under Rule 408, the evidence must be: (1) of an offer of valuable consideration to compromise a claim which was disputed as to either validity or amount; (2) proffered to prove liability for or invalidity of the claim or its amount. There is no indication on the face of the Counterclaim that Kime's allegations regarding French's position on the value of his stock refer to settlement discussions. To the contrary, on their face, these allegations refer to French's statement to Kime upon Kime's termination that Kime would be paid $150,000 for his stock, a memorandum stating that the Board of Directors had decided that the "agreed price per share is $1000," a subsequent letter from Clark French to Kime stating that CIA-DC "will be purchasing your shares at $500 per share," and Clark French's statement to Kime that he personally would purchase Kime's shares for a total of $600, based on the subscription price of $10 per share, which is the same amount he is trying to force Kime to accept in this lawsuit. Counterclaim ¶¶ 28, 31, 32, 33 and 38. Nor do Counterclaimants present any evidence in support of their motion that any of the allegations they seek to strike concern settlement negotiations. The motion to strike should be denied on this basis alone.

Moreover, French's statements regarding the value of the stock were never an offer to settle a "claim" within the meaning of Rule 408. Kime made no claim. Rather, French's position on the value of Kime's stock was offered in the context of *implementing the provisions of the Restrictive Stock Transfer Agreement* that required Kime, upon the cessation of his employment, to sell his shares to either CIA-DC or its shareholders at a price "agreed upon in writing by all the Stockholders." Counterclaim ¶¶ 15-16.

Further, although Counterdefendants assume that these allegations are for the purpose of supporting Kime's claim that he should be paid more than $600 for his shares, Motion to Dismiss at 22, that is not their purpose. No one disputes that, *if* the value of the stock is based on its original subscription price, the value would be $600, (60% of $1000). *See* Counterclaim ¶¶ 10-12, 15-16. Rather, the issue is whether or not the original subscription price set by the Board of Directors constitutes a value "agreed upon in writing by all of the Stockholders" within the meaning of the Restrictive Stock Transfer Agreement. Counterclaim ¶¶ 16, 20. Kime asserts in this lawsuit that the provision in the Restrictive Stock Transfer Agreement stating that the price at which Kime must offer his shares is the value "agreed upon by the Stockholders" requires French to act reasonably and in good faith with regard to valuing the stock, which he has failed to do. Counterclaim ¶ 62. Therefore, Kime seeks an appraisal to resolve the issue. Counterclaim pg. 33. French's increasingly diminishing offers for Kime's shares are not proffered to challenge the validity of French's $600 figure, but to demonstrate French's bad faith with regard to his obligation under the Restrictive Stock Transfer Agreement to reach an agreed-upon valuation with Kime. By its terms, Rule 408 does not exclude evidence offered for a purpose other than establishing the validity or invalidity of a claim, such as bias. Thus, Kime's allegations regarding French's valuation of his stock are not excludable from evidence under Rule 408.[3]

---

[3] In the caption of the motion, counterclaimants also seek to strike paragraphs 30 and 35 of the Counterclaim. Paragraph 30 has nothing to do with the valuation of Kime's stock. It concerns French's suggestion that Kime enter into an arrangement with CIA-DC whereby he would continue to service certain contracts after his termination. Paragraph 35 states that French refused to discuss valuation methodology and took the position that the stock could not be valued. Counterdefendants omit paragraph 35 from their prayer for relief. Motion to Dismiss at 35. In any event, French's statements in paragraph 35 clearly are not an offer of compromise concerning the value of Kime's stock and are not being proffered to establish the validity or invalidity of any claim.

**Conclusion**

For the foregoing reasons, Counterdefendants' motion should be denied in its entirety. To the extent the Court believes that the Counterclaim is deficient in any way, Kime requests that the court give him leave to amend the Counterclaim to correct the deficiency.

Respectfully submitted,

SCHMELTZER, APTAKER
& SHEPARD, P.C.

ss/ *Katherine Brewer*
Katherine Brewer, # 375608
Edward R. Levin, # 7823
2600 Virginia Ave., N.W.
Suite 1000
Washington, D.C. 20037
(202) 333-8800
(202) 625-3301 (facsimile)

*Attorneys for Defendant/Counterclaim Plaintiff Roy Kime*